**Tina JOHNSON, et al., Plaintiffs,**

**v.**

**William SMITH, et al., Defendants.**

**No. 92 C 5495.**

United States District Court,
N.D. Illinois,
Eastern Division.

March 8, 1995.

Richard M. Hoffman, James Ferguson, Sonnenschein, Nath & Rosenthal, Elizabeth Shuman-Moore, Chicago Lawyers Committee for Civil Rights Under the Law, Chicago, IL, for plaintiffs.

Marshall Kaplan, Jeff Arshonsky, for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Tina Johnson, Steve Johnson, Tracy Johnson, Rose Johnson and Jilda Johnson Lewis (collectively "Johnsons") have moved under Fed.R.Civ.P. ("Rule") 56(c) for a summary judgment on the issue of liability against the remaining nondefaulted defendants in this action: on Counts I through VI against defendant William Smith ("Smith") and Brian Emberton ("Brian") and on Count IV as to David Emberton and Julia Emberton (collectively "Brian's Parents"). For the reasons stated in this memorandum opinion and order, Johnsons' motion is granted in its entirety.

Although the time that this Court had set for defendants' responses to Johnsons' motion has come and gone, the only response of any nature that this Court has received has been that from Smith's lawyer. Instead of dealing with the merits, Smith (through his counsel) asks that this Court not rule on Johnsons' motion at all, calling to his aid for that purpose *10–Dix Bldg. Corp. v. McDannel,* 134 Ill.App.3d 664, 89 Ill.Dec. 469, 480 N.E.2d 1212 (1st Dist.1985). In that respect Smith states in his current filing, and this Court accepts, that because he has not yet gone to trial on the state criminal charges against him (which grow out of the same incident that triggered this lawsuit), he will exercise his Fifth Amendment privilege against self incrimination rather than responding substantively to Johnsons' factual assertions.[1]

Quite apart from the question whether *any* state court decision on a matter of state *procedure* (an accurate description of *10–Dix*) can properly control (or even inform) a federal district judge who is called upon to decide a Rule 56 motion in a federal constitutional-question case, *10–Dix* does not support Smith's contention here. No one is seeking to hold Smith in contempt, or to compel him to testify or to produce documents, if he chooses—as is his absolute right—to invoke the Fifth Amendment instead of responding

---

1. Smith's state court trial has been repeatedly deferred and long delayed, both as the result of motions advanced by Smith and for other reasons. Smith's current filing says that the trial is now set for March 17, 1995, but other dates previously reported by Smith's counsel as anticipated disposition dates have not been adhered to (this does not attribute any fault in that respect to Smith's counsel, who cannot of course control the state judges' calendars). Moreover, even if Smith *did* go to trial on March 17 and the trial resulted in a conviction, it would be entirely possible (and in Smith's best interests) for him to persist in his Fifth Amendment posture pending the disposition of any appeal.

to Johnsons' factual submissions. But if he does wrap himself in the Fifth Amendment's mantle, Smith must abide the consequences of the fact that a defendant's assertion of the Fifth Amendment in a civil case instead of responding to a plaintiff's proof may have adverse consequences that do not attach to a Fifth Amendment claim by a criminal defendant (*Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *National Acceptance Co. of Am. v. Bathalter*, 705 F.2d 924, 930–32 (7th Cir. 1983)).[2] Though Smith may view that as a Hobson's Choice, this Court holds that he cannot legitimately obtain a deferral of Johnsons' Rule 56 motion, effectively holding Johnsons' lawsuit hostage now that they and their lawyer have run out of the extraordinary patience that they have exhibited to this point.[3]

### Facts [4]

On August 15, 1990 Smith and Brian, together with other defendants in this action, burned a cross in Johnsons' yard and threw a brick through the window of their residence. Those intentional acts were committed solely because Johnsons (other than Tina Johnson) are African–American and because Smith, Brian and the others wanted to drive Johnsons out of the Smith–Emberton neighborhood (which had been predominantly occupied by white persons before Johnsons moved in).

That outrageous conduct was both humiliating and intimidating to Johnsons. Steve and Tracy Johnson have already moved out of the neighborhood as a direct consequence of the cross-burning incident, and Tina Johnson is now planning to move out of the neighborhood for the same reason.

### Johnsons' Claims

As already indicated, Johnsons have asserted a number of claims in six separate counts. Each of those claims is supported by the preceding brief factual recital and by the more elaborate GR 12(m) factual statement attached as Ex. 1. Only a brief statement of the relevant law is needed to deal with each of the six claims.

■ Count I charges violations of 42 U.S.C. § 1982. This Court's earlier opinion in this case (the "Opinion," 810 F.Supp. 235 (N.D.Ill.1992)[5]) has already agreed with the earlier decision by this Court's then colleague Honorable Nicholas Bua (*Stirgus v. Benoit*, 720 F.Supp. 119, 121–22 (N.D.Ill. 1989)) that such a claim imposes liability against defendants such as Smith and Brian (Opinion at 237). And that is equally true as to the claim brought under the same statute by Tina Johnson, as the Caucasian mother of African–American children (*Cato v. Jilek*, 779 F.Supp. 937, 940–41 (N.D.Ill.1991) and cases cited there).

■ Count II is brought under 42 U.S.C. § 1985(3). Here the conduct that Johnsons have proved against Smith and Brian constitutes an unlawful conspiracy as that concept is explained in such cases as *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984). And the other facets of a claim under that statute, as defined in *Griffin v. Breckenridge*, 403 U.S. 88, 102–05, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971), have also been satisfied here. In both those respects, see Opinion at 238.

2. This Court's colleague Honorable Charles Norgle, Jr., citing and relying on *Baxter* and *National Acceptance*, has reached the identical conclusion in an identical situation: defendants' decision to assert the Fifth Amendment rather than responding to a plaintiff's factual presentation in support of a Rule 56 motion (*LaSalle Bank Lake View v. Seguban*, 851 F.Supp. 336, 339 (N.D.Ill.1994)).

3. As the case number indicates, this action has been pending for some 2½ years. In substantial part (though not entirely) Johnsons have been delayed by the pendency of Smith's criminal trial—both in terms of discovery and in terms of moving toward ultimate judgment.

4. What follows is a highly abbreviated summary of the facts in this case. Johnsons' detailed statement of the uncontested material facts, submitted pursuant to this District Court's General Rule ("GR") 12(m), is a thorough and wholly accurate presentation of the evidence that Johnsons have submitted (coupled with appropriate record references). This Court attaches that GR 12(m) statement and adopts it as constituting its own factual findings in support of this opinion.

5. Further citations to the Opinion will simply take the form "Opinion at —," citing the F.Supp. page number but omitting repetition of the volume number.

■ As for Count III, brought under the Fair Housing Act (42 U.S.C. § 3617), Opinion at 238–39 has already upheld that claim in pleading terms. And what Johnsons have now proved in their Rule 56 motion has confirmed the liability of Smith and Brian on that claim.

■ Count IV asserts that the identical conduct by Smith and Brian also violated a state law, the Illinois "hate crime" statute (720 ILCS 5/12–7.1). That is so because the conduct proved by Johnsons constitutes mob action under 720 ILCS 5/25–1(a)(1) (*People v. Johnston,* 267 Ill.App.3d 526, 532, 204 Ill.Dec. 468, 472, 641 N.E.2d 898, 902 (1st Dist.1994)) and because the actions were taken for racially discriminatory purposes. Indeed, Brian's criminal conviction under the predecessor to the hate crime statute would likely be prima facie evidence of the facts establishing his violation of the statute (*Thornton v. Paul,* 74 Ill.2d 132, 147–50, 23 Ill.Dec. 541, 547, 384 N.E.2d 335, 341–42 (1978)). Because of Brian's unemancipated minority status at the time of the cross burning, Brian's Parents are also civilly liable under the Illinois statute.

■ Next Johnsons advance in Count V an Illinois common law claim for intentional infliction of emotional distress. Although the Illinois requirements to establish such a claim are demanding (*Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 89, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976); *McGrath v. Fahey,* 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988)), they are more than amply satisfied here (see Opinion at 237 & n. 3, 238).

■ Finally, Count VI is still another state-law claim, this one sounding in trespass. In a sense that claim is the easiest of all to establish, because it requires only proof of an intentional invasion of an owner's exclusive possession of real estate that detracts from the owner's use (see, e.g., *Dietz v. Illinois Bell Tel. Co.,* 154 Ill.App.3d 554, 559, 107 Ill.Dec. 360, 362, 507 N.E.2d 24, 26 (1st Dist.1987)). Johnsons have proved that here.

*Conclusion*

Although Johnsons need to prevail only on any one of their claims to be successful in this action, their different claims may carry different consequences in terms of such things as (for example) their recoverable damages or the award of attorneys' fees and expenses to them as prevailing parties.[6] In this instance Johnsons have proved the liability of the respective defendants on each of the counts in which they are named. There are no genuine issues of material fact, and Johnsons are entitled to a judgment as to liability as a matter of law against each of William Smith and Brian Emberton on each of Counts I through VI and against each of David and Julia Emberton on Count IV. This Court will await further action by Johnsons in terms of their moving to prove up their damages against those defendants (and simultaneously against other defendants who have previously defaulted in this action).

APPENDIX

### PLAINTIFFS' RULE 12(M) STATEMENT OF UNCONTESTED MATERIAL FACTS

Pursuant to Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois, plaintiffs hereby submit their Statement of Uncontested Material Facts in support of their Motion for Summary Judgment on Counts I through VI as to Certain Defendants.

#### The Parties

1. At all times relevant to this action, plaintiffs Tina Johnson, Steve Johnson, Tracy Johnson, Rose Johnson, and Jilda Johnson Lewis (the "Johnsons") lived at 2225 West Cullom Avenue, Chicago, Illinois, a predominantly white neighborhood on Chicago's northwest side. (Complaint, ¶¶ 4–8, 17; Smith Answer, pp. 1–2; Emberton Answer, ¶¶ 3, 7.)

2. Plaintiff Tina Johnson is a Caucasian of Italian descent, whose former husband is of African–American descent. (Complaint, ¶ 4; Smith Answer, p. 1; Emberton Answer,

---

6. Needless to say, no double recovery will be permitted by this Court.

¶ 3.) The remaining plaintiffs are all of African–American descent. (Complaint, ¶¶ 5–8; Smith Answer, p. 1; Emberton Answer, ¶ 3.)

3. Defendants William Smith and Brian Emberton (hereinafter "Smith and Emberton") are Caucasians. (Smith Answer, p. 1; Emberton Answer, ¶ 4; Exs. A and B.) So are the other participants, Kevin O'Brien, Christopher Stephens and William Glowacki. (Exs. C–E.)

4. Defendant Brian Emberton resided at 5144 North Troy, Chicago, Illinois, and was a minor at the time of the conduct giving rise to this action. (Emberton Answer, ¶¶ 4, 21.)

5. Defendants David Emberton and Julia Emberton are residents of Cook County, Illinois and are the parents of Brian Emberton. (Emberton Answer, ¶ 6.)

### Defendants' Pre-disposition and Premediation

6. During the summer of 1990, defendants William Smith, Brian Emberton, Kevin O'Brien, Christopher Stephens, and William Glowacki (collectively, the "Perpetrating Defendants") were members of a group known as the "Doobie Brothers Partiers" or "DBPs". (Emberton Dep., p. 21.) Almost every weekend that summer various Perpetrating Defendants met at Kevin O'Brien's house. (*Id*, p. 22.)

7. Kevin O'Brien testified that, with his permission, each of the Perpetrating Defendants wrote inscriptions on his bedroom wall, though he could not attribute specific inscriptions to particular defendants. (O'Brien Dep., pp. 40, 43). Photos of the inscriptions on Kevin O'Brien's bedroom walls in August 1990 are attached hereto as Ex. F. (*Id.*, pp. 34–35.) These inscriptions include swastikas and references to the "KKK." (*Id.*, pp. 40, 43.)

8. One of the inscriptions on Kevin O'Brien's bedroom wall at the time read: "NIGERS WILL DIE! SPICKS WILL PAY! OUT OF THE DARKNESS COMES THE KKK!" (Ex. F, p. CPD 00011.) Kevin O'Brien testified that he heard the other Perpetrating Defendants use this phrase, though he was unable to specifically identify which of the other Perpetrating Defendants

made these statements. (O'Brien Dep., pp. 45–46.)

9. In approximately May 1990, O'Brien built a cross from a baseboard under his porch, saving it to burn later in another black family's yard. (O'Brien Dep., pp. 70–72.) The cross was built and stored in O'Brien's garage. (*Id.*)

### Defendants Burned a Cross in Plaintiffs Yard and Threw a Brick Through Their Window

10. On the evening of August 14, 1990, the Perpetrating Defendants met at O'Brien's house. (O'Brien Dep., p. 74; Emberton Dep., pp. 51–52.) At some time between 1:00 a.m. and 3:00 a.m. on August 15, Kevin O'Brien suggested that the Perpetrating Defendants burn the cross stored in his garage on the lawn of an African–American family. (O'Brien Dep., pp. 78–79; Emberton Dep., pp. 49–50.)

11. The Perpetrating Defendants then went to Kevin O'Brien's garage. O'Brien and one of the other Perpetrating Defendants retrieved the cross from the garage and poured gasoline from a lawn mower into a milk carton. (O'Brien Dep., pp. 79–80; Stephens Dep., p. 50; Emberton Dep., pp. 55–56.)

12. The Perpetrating Defendants then walked east down an alley behind O'Brien's house, heading toward Bell Avenue. (O'Brien Dep., p. 81.) During this time, Emberton obtained a brick, a photograph of which is attached as Exhibit G. (Emberton Dep., pp. 48, 57.) Originally, the Perpetrating Defendants had planned to burn the cross in the yard of another black family in the neighborhood. (O'Brien Dep., p. 69.) However, while they were in the alley, the Perpetrating Defendants decided to burn the cross in the Johnsons' yard instead. (O'Brien Dep., p. 84; Emberton Dep., p. 67.)

13. Arriving at the Johnsons' residence, Smith, Emberton, and O'Brien assembled on the front lawn, while Glowacki and Stephens watched from the corner of Cullom and Bell. (Stephens Dep., pp. 67–68; Emberton Dep., pp. 63–66.)

14. William Smith planted the cross into the Johnsons' yard, and O'Brien poured gasoline on the cross. (Stephens Dep., p. 68; O'Brien Dep., pp. 87–88; Emberton Dep., p. 64.) Smith then lit the cross on fire and Emberton threw the brick he had picked up in the alley through the Johnsons' front window. (Ahern Dep., p. 87; Pascual Dep., p. 41; Emberton Dep., pp. 65–66, 90–91.) Exhibit H is a photograph depicting the damage to the window broken by the brick Emberton threw. (*Id.* at 65.)

15. After lighting the cross and throwing the brick through the Johnsons' window, the Perpetrating Defendants fled back to O'Brien's house. (O'Brien Dep., p. 93; Emberton Dep., pp. 72–73.)

### Defendants' Conduct was Racially Motivated

16. At the time of the cross-burning, the Perpetrating Defendants knew that the residents of 2225 West Cullom, the Johnsons, were black. (Emberton Answer to Req. for Admis., ¶ 3; Emberton Dep., p. 92; O'Brien Dep., p. 67.) The Perpetrating Defendants committed these acts solely because of the Johnsons' race. (Emberton Dep., p. 92.)

17. Furthermore, on several occasions, William Smith expressed a personal animosity toward blacks, occasionally referring to them as "niggers," (Stephens Dep., pp. 36–37), and stating that he did not like them living in his neighborhood. (O'Brien Dep., pp. 49–50; Stephens Dep., pp. 36–37.)

### Defendants were Arrested and Defendants Brian Emberton, Christopher Stephens and Kevin O'Brien were Tried and Convicted of Ethnic Intimidation

18. On the morning of August 15, 1990, officers from the Chicago Police Department, including Officer Chris Ahern of the Neighborhood Relations Division, met with the Perpetrating Defendants at O'Brien's house. (O'Brien Dep., pp. 105–07; Ahern Dep., pp. 32–33; Ex. I.) When questioned about the incident, each of the Perpetrating Defendants denied knowing anything. *Id.*

19. At 11:00 a.m. on August 16, 1990, Officers Ahern and Demetrio Pascual of the Neighborhood Relations Division, as well as other officers of the Chicago Police Department, returned to O'Brien's residence for further questioning. (Ex. I; Ahern Dep., pp. 40–41; O'Brien Dep., p. 109.) During this meeting, O'Brien openly confessed his involvement in the incident. (Ahern Dep., p. 44; Pascual Dep., pp. 35–37; O'Brien Dep., p. 112.) O'Brien also told the officers that the other Perpetrating Defendants were involved in the cross burning. (Ahern Dep., pp. 45–46; Pascual Dep., pp. 39–43.)

20. The Perpetrating Defendants were each arrested, except for Christopher Stephens, who turned himself in. (Exs. A–E, I; Ahern Dep., pp. 50–51.) Upon further questioning at the police station, each of the Perpetrating Defendants admitted their roles in the cross burning incident. (Ex. I; Ahern Dep., pp. 81, 86–87; Pascual Dep., pp. 55–56, 64–65, 67–68; Emberton Dep., p. 84.)

21. Based upon their conduct in this incident, Emberton, O'Brien, and Stephens were convicted of Ethnic Intimidation, now known as Hate Crime, 720 ILCS 5/12–7.1. (Emberton Answer, ¶ 12; O'Brien Dep., p. 10; Stephens Dep., p. 38; Exs. J–L.) William Glowacki was tried as a juvenile for his part in the incident. (Ahern Dep., p. 100.)

22. Because of the Perpetrating Defendants' conduct, the Johnsons have suffered severe emotional distress, feeling alienated and fearful in their own home. (Declaration of Tina Johnson ["Tina Dec."], Exhibit M hereto, ¶¶ 3–7; Declaration of Tracy L. Johnson ["Tracy Dec."], Exhibit N hereto, ¶ 4.) In fact, Steve and Tracy Johnson moved out of the neighborhood because of the incident. They were planning on starting a family, but didn't want to raise their children in a racially hostile environment. More importantly, they feared for the safety of their children. (Tracy Dec., ¶ 5; Declaration of Steven Johnson ["Steven Dec."], Exhibit O hereto, ¶ 4.)

23. Since the incident, Tina Johnson has been fearful and distraught. Initially, she missed time at work because she was afraid to leave her 13 year old son Victor home alone. She also began cabbing to work, spending $20 per day which she could ill afford to spend, because she was afraid to

**1156**

walk past Kevin O'Brien's house. (Tina Dec., ¶¶ 3–5.)

24. To this day, Tina Johnson takes valium, which was prescribed to calm her nerves, as a result of the incident. (Tina Dec., ¶ 7.) Moreover, the family has become increasingly concerned about Tina and Victor living in the neighborhood where the family was terrorized. The family has therefore put the Property up for sale. Once it is sold, Tina and Victor will also move out of the neighborhood—all as a result of the fear and trauma caused by the Perpetrating Defendants. (Tina Dec., ¶ 8; Steven Dec., ¶ 5.)

25. In addition, plaintiffs suffered damages for the cost of repairing the broken window and the damage to their lawn. Tina Johnson also incurred medical costs and lost wages as a result of injuries she suffered on the broken glass from the window. (Tina Dec., ¶ 6; Steven Dec., ¶ 7.)

Respectfully submitted,

TINA JOHNSON, STEVE JOHNSON, TRACY JOHNSON, ROSE JOHNSON, and JILDA JOHNSON LEWIS

By: /s/ [Signature]

    One of their Attorneys

James R. Ferguson

Richard M. Hoffman

Sonnenschein, Nath & Rosenthal

8000 Sears Tower

Chicago, Illinois 60606

(312) 876–8000

Elizabeth Shuman–Moore

Chicago Lawyers Committee for Civil Rights Under Law

185 N. Wabash Ave., Suite 2110

Chicago, Illinois 60601–3607

Dated: January 19, 1995